## GULF, C. & S. F. RY. CO. v. CLEMENT.
### (No. 9216.)

(Court of Civil Appeals of Texas. Ft. Worth. Feb. 7, 1920. On Motion for Rehearing, March 20, 1920.)

**1. Master and servant ⬅88(3)—Independent contractor guilty of contributory negligence cannot recover.**

An independent contractor guilty of negligence contributing to his injury through his employer's negligence is barred from recovery.

**2. Master and servant ⬅277 — Evidence of relation held sufficient.**

In an action for injuries to a refinery company's employé endeavoring to stop a leak in a tank car at request of railroad's yardmaster, evidence *held* sufficient prima facie to sustain finding of relationship of master and servant between plaintiff and railroad.

**3. Master and servant ⬅265(1)—Burden of negativing employment rests on defendant.**

To show that a refinery company's employé was employed as an independent contractor to stop a leak in a tank oil car, it was incumbent upon employing railroad employé sued for his injuries to plead and prove special facts negativing prima facie showing that he was employed as any other employé, though possessing special skill.

**4. Master and servant ⬅204(1) — Assumed risk available under federal act.**

The defense of assumed risk is available to the employing railroad under the federal Employers' Liability Act (U. S. Comp. St. §§ 8657–8665), applicable where the injury was in interstate commerce.

**5. Master and servant ⬅158—Negligence in exposing employé to explosion of tank car proximate cause of injury.**

Any negligence of a railroad in exposing an employé to danger of explosion from casing head gasoline in a car in which he was requested to remedy a leak without informing him of danger by stating car contained unrefined naphtha could properly have been found a proximate cause of injury to employé when after lossening dome cap on car gas and gasoline escaped and caught fire.

**6. Negligence ⬅59—Test of proximate cause stated.**

Test as to whether or not act or omission amounting to negligence is proximate cause of injury is whether or not injury is natural or probable consequence of such act or omission, and whether or not injury of such character should reasonably have been foreseen as consequence, in light of circumstances.

**7. Evidence ⬅7 — That petroleum products emit gas matter of common knowledge.**

It is a matter of common knowledge that substances such as naphtha, crude oil, and ordinary gasoline will emit gas.

**8. Master and servant ⬅125(7) — Railroad held not put on notice of mislabeling of car of gasoline.**

Leakage of gas from plug and edges of dome cap on car containing gasoline *held* insuf-

ficient to put railroad's employés on notice contents had been mislabeled unrefined naphtha in bill of lading, and that car contained casing head gasoline, to make cause of action for negligence in favor of refinery company's employé requested to remedy leak, particularly where explosion would not have occurred if employé had not loosened dome cap.

**9. Master and servant ⬅264(2) — Issue of negligence cannot be split.**

Single issue of negligence of railroad in inducing refinery company's employé to expose himself to danger of explosion in repairing leaky car of gasoline stated to contain unrefined naphtha could not be split so as to make separate issue of each circumstance pertinent to main issue, as failure previously to inspect the car, act of bringing it into yards, etc.

**10. Master and servant ⬅217(20)—Risk in repairing gasoline tank car assumed.**

Though railroad was negligent in failing to inspect car loaded with gasoline, and in representing to employé of refinery company, requested to repair leak, that it was loaded with unrefined naphtha, refinery company's employé assumed risk of injury where prior to time car exploded after he loosened dome cap he either learned it contained gasoline or something more dangerous.

### On Motion for Rehearing.

**11. Master and servant ⬅286(27)—Negligence in directing expert remedying condition of tank car held not proved.**

In an action against a railroad for injuries to refinery company's employé requested to remedy leak in car stated to be loaded with unrefined naphtha, but in fact containing gasoline, evidence *held* insufficient to support finding railroad's yardmaster, rather than plaintiff, instigated and directed act of unscrewing dome cap on car, which caused injury through explosion; step having been taken rather at plaintiff's direction.

**12. Master and servant ⬅217(1) — Consequences of assumed risk not excused by acts of superior servant.**

Injured employé is not excused from consequences of assumed risk because another servant also assumed same risk at same time, in absence of testimony that other as vice principal specifically commanded plaintiff servant to assist him in doing dangerous work, assuring him there was no danger.

**13. Master and servant ⬅107(3)—No duty to furnish safe place for expert employed to remedy dangerous condition.**

Refinery company's employé having been employed by railroad as expert to remedy a dangerous leaky condition in an oil car, general rule imposing on master duty to furnish a safe place to work was not applicable.

**14. Witnesses ⬅397—Jury may disregard impeaching statements.**

In servant's action for injury, it was within province of jury to disregard statements signed by plaintiff before trial and impeaching his testimony, and to credit his testimony on trial.

⬅For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

Appeal from District Court, Cooke County; John Speer, Judge.

Action by W. J. Clement against the Gulf, Colorado & Santa Fé Railway Company. From judgment for plaintiff, defendant appeals. Reversed and rendered.

Garnett & Garnett, of Gainesville, Terry, Cavin & Mills, of Galveston, and Frank J. Wren, of Ft. Worth, for appellant.

Stuart, Bell & Moore, of Gainesville, for appellee.

DUNKLIN, J. There was an explosion of gasoline in a tank car in the yards of the Gulf, Colorado & Santa Fé Railroad Company in the town of Gainesville. W. J. Clement was seriously burned as a result of that explosion, and the railway company has prosecuted this appeal from a judgment rendered in his favor for damages for the injuries so sustained.

R. G. Porter was the defendant's yardmaster at Gainesville, and, upon discovering that gas was spewing from the car, called upon W. J. Clement to remedy that leaky condition. Clement was then working for the Producers' Refinery Company in Gainesville, and frequently had been called upon by Porter to look after leaky oil cars coming into defendant's yards inasmuch as he had the necessary tools and equipment for that work, with which he was familiar. Clement had formerly been employed by the railway company in its train service as a switchman and brakeman, but was not so engaged at the time of the accident. The railway company always paid him for his services in relieving the leaky condition of cars.

When Porter applied to Clement to stop the leak in the car on the occasion of the accident, he told Clement that the contents of the car was "unrefined naphtha," and that was the designation of its contents in the waybill which came with the car and was the source of the information given by Porter to Clement. The car contained casing head gasoline or casing head gasoline blend instead of unrefined naphtha, and was an interstate shipment originating in Drumright, Okl., and moving to Port Arthur, Tex. The place of the origin of the shipment was not on the defendant's line, but upon the line of a connecting carrier; the waybill designating the contents of the car as unrefined naphtha being furnished to the defendant by the connecting carrier. In the top of the car there was a manhole which was closed by what is called a dome cap screwed into the opening of the hole. Near this dome cap there was also a three-quarter inch plug, and the leak mentioned was around this plug and the dome cap. Porter went with Clement to the car, and, after examining it and discovering the source of the leak, they took the plug out and replaced it with another.

Gus Vineyard, one of Clement's employés in his work for the Producers' Refinery Company, went with him as an assistant to remedy the leaky condition of the car.

The gas pressure from within the car was so strong that it seriously interfered with the work of replacing the old plug with the new. After the new plug was put in, and after plaintiff and Porter had loosened the dome cap, the dome cap was blown out by the gas pressure in the car, and the escaping gas and gasoline mixed therewith, which was thrown high in the air, caught fire, and before they could escape Porter and Clement were both severely burned; the injuries to Porter proving fatal.

The trial was before a jury, whose verdict was upon special issues submitted by the court. Thirty-six questions were propounded to the jury, and we shall not undertake to set them out in full, but shall give the substance only of some of them and copy the remainder. Properly speaking, there were not 36 controlling issues in the case, and necessarily many of the questions submitted to the jury related to evidence bearing upon the issues and were not the issues themselves. The following are findings of the jury, stated in narrative form, in answer to some of the questions propounded to them:

The car contained casing head gasoline or a casing head gasoline blend, and Porter, the yardmaster, represented to the plaintiff that it contained unrefined naphtha, and upon such representation plaintiff was induced to go and inspect the car.

R. G. Porter, the yardmaster, requested the plaintiff to inspect the car and to offer such suggestions as to what, if anything, should be done with it. The making of such request, under the conditions as they existed at the time, was negligence, which was one of the proximate causes of plaintiff's injuries.

There was a placard upon the dome cap of the car containing a caution against the removal of the dome cap while there was gas pressure inside the car, and plaintiff saw the same, or by the exercise of ordinary care should have seen it.

Plaintiff, acting either by himself or in conjunction with another, loosened the dome cap, and such loosening of the dome cap caused the subsequent explosion. The explosion would not have occurred if the dome cap had not been loosened, and the loosening of the dome cap was the proximate or one of the proximate causes of plaintiff's injury.

At the time Porter and Clement went upon the tank car there was no liquid escaping around the dome cap or the safety valves, but gas and vapor were escaping from the plug and dome cap. Before plaintiff went upon the tank car he had five or six years' experience in handling the contents of tank cars when such contents consisted of gasoline. There

were switch lights burning in defendant's yards day and night, and knowledge of that custom had already been acquired by the plaintiff while he was previously in the service of defendant as a switchman or brakeman. After going upon said tank car and prior to the explosion, plaintiff, from his experience in handling gasoline, knew that the contents of the tank car was casing head gasoline.

The finding last referred to was in answer to question 29, and following are additional questions and answers:

"Question 30. If you answer issue No. 29 'Yes,' then state whether or not said Clement remained upon said tank car after knowing or believing that its contents were casing head gasoline. Answer: Yes; just a short time they were making arrangements to get down when the explosion came.

"Question 31. Would a reasonably prudent and careful man, in the exercise of ordinary care for his own safety, and possessing the knowledge and experience you may find plaintiff possessed at the time, have remained and worked on said car under the circumstances and conditions which you may find from the evidence existed at the time? Answer: No.

"Question 32. In requesting said Clement to come to said car, state whether R. G. Porter requested his presence as an expert in dealing with gasoline and other inflammable liquids. Answer: Yes.

"Question 33. At the time plaintiff went upon the car was he in the employment of the defendant? Answer: Yes.

"Question 34. If your answer to question No. 33 is 'No,' you need not answer this question, but if your answer is 'Yes,' did the plaintiff have knowledge of the risks and danger incident to the employment in which he was at that time engaged? Answer: No; not at the time he went on the car.

"Question 35. Does the evidence in this case show that the plaintiff was guilty of contributory negligence which was the proximate cause or one of the proximate causes of such injuries as he sustained? Answer: Yes."

In answer to question 9 the jury found that prior to the time the car exploded plaintiff learned that it contained casing head gasoline. The following were additional questions and answers: .

"Question 10. If your answer to question 9 is 'No,' you need not answer this question, but if in the affirmative, then what did the plaintiff do next after learning its real contents? Answer: He finished putting in the plug and started making arrangements to get down.

"Question 11. Was the plaintiff guilty of negligence as that term is herein defined to you in doing what you have stated he did do after learning the contents of the car? Answer: No.

"Question 12. Did the defendant exercise ordinary care to see that the car was properly inspected and that necessary caution labels were in proper place, and that the condition and contents of the car were as stated on the way bill of lading received by it from its delivering carrier? Answer: No.

"Question 13. If your answer to question 12 is in the affirmative, you need not answer this question, but if your answer is 'No,' then was such a failure upon the part of the defendant the proximate cause, or one of the proximate causes, of the injuries sustained? Answer: Yes. * * *"

"Question 15. Was it negligence on the part of the defendant to permit the car to stand in the yard under the circumstances and in the condition it was in from the time it was placed in the yard to the time of the injury? Answer: Yes.

"Question 16. If your answer to question No. 15 is 'No,' you need not answer this question, but, if your answer is 'Yes,' then was such negligence, the proximate cause, or one of the proximate causes, of the injury sustained by the plaintiff? Answer: Yes."

In answer to another question the jury assessed plaintiff's damages for his injury in the sum of $10,000, but deducted therefrom 25 per cent. on account of his contributory negligence, and accordingly judgment was rendered in plaintiff's favor for $7,500, thus giving defendant the benefit of its plea of contributory negligence on the part of the plaintiff.

[1-4] If the relation between plaintiff and defendant was not that of master and servant, but was that of employer and independent contractors, as is insisted by appellant, then it is quite clear that the jury's finding of contributory negligence on the part of plaintiff was of itself a complete bar to his right to recover. But we are of the opinion that the evidence was sufficient, prima facie at least, to sustain the finding of the existence of the relation of master and servant; and accordingly we shall adopt that finding as true. Plaintiff was employed for hire to do a particular work, and the fact that he was so employed by reason of his special skill, which was the only fact relied on to show that he was an independent contractor, would not of itself make plaintiff an independent contractor, since all servants are supposed to be competent to perform the duties assigned to them, and are employed for that reason. In order to show that plaintiff was employed as an independent contractor, it was incumbent upon defendant to plead and prove some special facts which would negative the prima facie showing that he was employed as was any other employé, such as a locomotive engineer, who is likewise employed because of his special skill in the operation of a locomotive. However, it is well settled that, even though the relation of master and servant was established, the defense of assumed risk was available to the defendant under the federal Employers' Liability Act, which is applicable here, since at the time of his injury plaintiff was engaged in the business of handling interstate commerce. Pedersen v. D., L. & W. Ry. Co., 229 U. S. 146, 33 Sup. Ct. 648, 57

L. Ed. 1125, Ann. Cas. 1914C, 153; 18 R. C. L. p. 830, and decisions there cited; Seaboard A. L. Ry. v. Horton, 233 U. S. 492, 34 Sup. Ct. 635, 58 L. Ed. 1062, L. R. A. 1915C, 1, Ann. Cas. 1915B, 475.

[5] We entertain no doubt that the negligence of the defendant, if established, in exposing plaintiff to the danger of an explosion from casing head gasoline, without informing him of the danger, might properly be held to be a proximate cause of plaintiff's injury, as was found by the jury.

[6] The test as to whether or not an act or omission amounting to negligence is the proximate cause of an injury is whether or not the injury is the natural and probable consequence of such act or omission, and whether or not an injury of that character should reasonably have been foreseen as such a consequence in the light of the attending circumstances. T. & P. Ry. Co. v. Bigham, 90 Tex. 223, 38 S. W. 162; Neely v. Ft. Worth & R. G. Ry. Co., 96 Tex. 274, 72 S. W. 159; Seale v. G., C. & S. F. Ry. Co., 65 Tex. 274, 57 Am. Rep. 602. But we are of the opinion that, as a conclusion of law, the evidence was insufficient to support the jury's finding that defendant, through its yardmaster, R. G. Porter, was guilty of negligence in inducing plaintiff to inspect the car which afterwards exploded, by representing to him that it contained unrefined naphtha instead of casing head gasoline, and thus leading him to expose himself to a danger which resulted in his injury.

[7, 8] The proof unquestionably established the following facts: The car was loaded by the Gypsy Oil Company, the shipper, at Drumright, Okl.; the defendant had nothing whatever to do with the loading; the car was delivered to the defendant by a connecting carrier; the bill of lading which accompanied it was in proper form, with the proper certificate from the shipper and showed that it contained unrefined naphtha; and neither Porter nor any other employé of the defendant had any reason to suppose that such designation of the contents of the car was untrue, and that, in fact, the car contained casing head gasoline. It is a matter of common knowledge that substances such as naphtha, crude oil, and ordinary gasoline, which latter, according to the unchallenged finding of the jury, plaintiff was in the habit of handling, will emit gas; and the leakage of gas from the plug and the edges of the dome cap, which, according to the proof, is a matter of common occurrence, was not sufficient to put any of defendant's employés on notice that the contents had been mislabeled in the bill of lading, and that the car in fact contained casing head gasoline. And this is especially true in view of the finding by the jury, of which plaintiff does not complain, that the explosion would not have occurred if plaintiff had not loosened the dome cap;

that finding being equivalent to a finding that the mere escape of gas and vapor from the car before the loosening of the dome cap was not dangerous. The bill of lading accompanying the car was introduced in evidence. It showed the contents of the car to be "unrefined naphtha," following which was this, "Inflammable Placard and Dome Cover Caution Cards Applied." It also contained the following certificate written thereon below what is copied above:

"This is to certify that the above articles are properly described by name and are packed and are marked and are in proper condition for transportation according to the regulations prescribed by the Interstate Commerce Commission. [Signed] Gypsy Oil Co., Gasoline Department, Shippers, by W. B. Massey, Supt."

R. H. Innes, who has been engaged in the service of the Bureau of Explosives since the year 1907, testified in the case, and no evidence was introduced contradicting the truth of the following testimony which he gave:

"It is my duty to notice the conduct of the business of oil companies, and I have done it for 11 years. * * *"

And after examining the bill of lading he further testified as follows:

"This bill of lading for car 1355 G. R. C. X. and the certificate of the shipper which shows the placard and certificate billed at Drumright would lead me to conclude that his certificate tells the truth. The shipper loads these cars for delivery to the railroad company, and the shipper attaches the placards, and puts the dome cap on, and makes the certificate as to its condition. When these are done the railroad company has to receive the car and transmit it. * * * A loading rack is a track alongside the pipe a long pipe from which other pipes lead, that you can let down in a tank car, or in some cases it is a track where they hold cars when they load them through the bottom. These pipes that convey casing head gasoline or whatever they are loading extend to the car from the plant. The car is placed near the loading rack on a track and then the oil company loads them. The owner of a car is required to test it and make the test on the car, the pressure test. The valves are supposed to be in good order. This man certifies it was in that condition when loaded. The interstate commerce conditions were complied with, and that necessitates that condition. The railroad company does not say what they put in the car, nor see it unless they happen to be there. They have no opportunity whatever except what is in the bill of lading and certificate for knowing what is in the car when it is announced ready for the initial railroad company. * * * If I knew at Shawnee that vapor was coming out from around this car, the rules of the Interstate Commission under those circumstances would be to accept the car and handle it. It would not kill people."

[9] If we are correct in our conclusion noted above that the evidence was insufficient

to support a finding that defendant was negligent in failing to discover that the car contained casing head gasoline instead of unrefined naphtha, as alleged by plaintiff, then it would follow, of course, that it also failed to sustain the further findings of negligence in failing to previously inspect the contents of the car, which, by the way, was necessarily involved in the issue mentioned above, negligence in bringing the car into its yards in Gainesville and negligence in permitting it to remain there until plaintiff was called upon to inspect it. But, aside from that conclusion, it is clear that neither the negligence, if any, in failing to previously inspect the car, or in bringing the car into the yards, or in permitting it to remain there, if considered separately and independently from the employment of plaintiff to go upon the car for the purpose of inspecting it, could be held to be the proximate cause of plaintiff's injury, since there was no contention that he would have been injured if he had not been so employed. If he had remained where he was working at the time he was employed by the defendant, he would not have been injured at all. Furthermore, the act of bringing the car into the yards and the act of permitting it to remain there led up to the employment of plaintiff to inspect it, but the single issue of negligently inducing plaintiff to expose himself to the danger of the explosion, which was the gravamen of his complaint and the main issue, could not be so split as to make a separate issue of each condition and circumstance pertinent to the main issue, such as the failure to previously inspect the car, the act of bringing it into the yards, and the act of permitting it to remain there until plaintiff was called upon to remedy its leaky condition.

The notice which was upon the dome cap referred to in the findings of the jury was introduced in evidence and was as follows:

CAUTION

AVOID ACCIDENTS.

DO NOT REMOVE THE DOME COVER WHILE GAS PRESSURE EXISTS IN TANK.

KEEP LIGHTED LANTERNS AWAY.

[10] The findings of the jury, considered in the light of the evidence, conclusively establishes the defense of assumed risk pleaded by defendant, even though the several findings of negligence of the defendant should each be held to be an independent issue and sufficient of itself to support a recovery. Snipes v. Bomar Cotton Oil Co., 106 Tex. 181, 161 S. W. 1; Bonnet v. G., H. & S. A. Ry. Co., 89 Tex. 72, 33 S. W. 334; St. L. S. W. Ry. Co. v. Hynson, 101 Tex. 543, 109 S. W. 929; 18 R. C. L. p. 830; Seaboard Air Line Ry. Co. v. Horton, 233 U. S. 492, 34 Sup. Ct. 635, 58 L. Ed. 1062, L. R. A.

1915C, 1, Ann. Cas. 1915D, 475. Furthermore, that defense was conclusively established by plaintiff's own testimony on the witness stand, independent of statements made by him to Mr. Greenwood, state fire marshal, as shown by the transcribed notes of a stenographer who took down his statements at the time they were made. That statement was in part as follows:

"Well, Mr. Porter phoned me he had a leaky car, and told me to come down and fix it. I went on down, and when I got there I saw we could not fix it, and I told him it was casing head gasoline and liable to blow up. He said it is billed out as unrefined naphtha. I told him there was no such stuff. We looked at the manhead and I showed him the precaution. I told him we never took no such precaution on our cars, and they were casing head gasoline."

The following is a part of the testimony given by plaintiff on the trial of the case:

"As to whether I testified when the state officials were up here examining into this fire and I testified before Mr. Greenwood, and Mrs. Simpson took down my testimony, will say some man and woman came over to my house and took a statement. I do not know what it was. They did not swear me. The caution I had reference to in that testimony was with reference to those gaskets, and I never said anything about casing head gasoline. As to what I meant by telling Mr. Porter the company never did take any such precaution on our cars, will say it was after I had taken the little cap outside and I noticed that pressure. I did not tell him it was casing head gasoline. I did not know it was, for I never saw any. It was something more dangerous than gasoline or unrefined naphtha. I thought that because of that gasket over there, the washer where the dome cap was screwed down. I told him that I was of the opinion that by reason of that precaution being taken it was something more dangerous than gasoline or unrefined naphtha. As to whether I went on and told him that we had some engines up in the yard and I told him he had better move away, that it might explode, will say I might have suggested that about a road engine. There was an engine at the roundhouse that I was telling Mr. Greenwood about. I told him there was one setting down at the south end of the yard. As to whether I told him to move that tank car away that I was working on, will say I do not know the words exactly. I told him the best thing he could do was to take this tank car away—to get it clear away. I told him to do that because I regarded it as dangerous and it might explode. I did regard it as dangerous and thought there was danger of its exploding. I have been telling you all the time that we moved that plug and tried to put in a new one, and that we turned the dome cap about halfway, maybe not so far around, maybe a fourth. We took a 36-inch Stilson wrench to do it, both of us pulling on it. I answered that I do not think there was very much of an increase of vapor after we turned it."

The gravamen of plaintiff's case was that defendant negligently induced him to expose

himself to the danger of an explosion; and, if he realized that danger and thereafter voluntarily exposed himself to it, it was immaterial that he did not then know that the car was loaded with casing head gasoline, rather than unrefined naphtha, if, in fact, he was then ignorant of the character of its contents; and the testimony of plaintiff himself referred to above would have warranted a peremptory instruction that he assumed the risk of his injury.

For the reasons indicated, the judgment of the trial court is reversed, and judgment is here rendered in favor of the appellant.

### On Motion for Rehearing.

The evidence showed that the dome cap was loosened by the joint efforts of plaintiff and Porter who used a Stilson wrench for that purpose. Appellee's motion for rehearing contains the following:

"This honorable court, as well as the jury, found that one of the causes of the explosion and the consequent injury was the act of the appellee in loosening the dome cap. Granting this to be true, and granting that the appellee was guilty of contributory negligence as found by the jury in loosening this dome cap, then this honorable court cannot escape the proposition that the master was also guilty of negligence in assisting in loosening the dome cap. This proposition was entirely overlooked by this honorable court in its opinion."

Appellee also quotes the following allegation contained in its petition filed in the trial court upon which the case was tried:

"That the defendant negligently caused and permitted the cap on the dome of said car to be removed, loosened, and thus permitted said gas or other substance to escape into the air and yards of the defendant, where fire and live engines were in close proximity, and said gas became ignited and exploded as aforesaid."

Following are some of the issues submitted to the jury, apparently intended to present the issue of negligence last referred to:

"Question 4. Did the defendant company or any one of its employés remove or cause or permit the dome cap on the car in question to be removed or loosened prior to the accident? Answer: Yes.

"Question 5. If your answer to question 4 is 'No,' you need not answer this question, but, if in the affirmative, then you will answer: Was such removal or loosening thereof negligence as that term is herein defined? Answer: Yes.

"Question 6. If your answer to question 5 is 'No,' you need not answer this, but, if in the affirmative, then was such negligence the proximate cause or one of the proximate causes of plaintiff's injury? Answer: Yes."

Our failure to discuss the findings of the jury upon the issues just quoted was induced by the following statement contained in the outset of plaintiff's brief, submitted on original hearing, of the issues of negligence upon which he relied for a recovery:

"(1) Plaintiff contends that the defendant was guilty of negligence in that the yardmaster misled the plaintiff by telling him that the car was a car of unrefined naphtha or crude oil and causing him to go on the car under said misapprehension, when in truth and fact it was a car of casing head gasoline.

"(2) In permitting the car of casing head gasoline to be and remain in the yards while the same was spewing and escaping.

"(3) In permitting the car of casing head gasoline to come into the yards of the defendant while the same was in said condition.

"(4) In having said car so constituted that the gasoline escaped from the same and the cap come off.

"Proof was offered under each and all of said claims, and will be submitted in statements under the separate counter propositions."

In answer to questions 25 and 26, the jury found that prior to the time plaintiff went upon the tank car in question he had had five or six years' experience in handling the contents of tank cars where such contents was gasoline, and the following are additional issues submitted and the findings of the jury thereon:

"Question 27. Why and for what purpose did the said Porter request said Clement to come to said car? Answer: To examine leaky car."

"Question 32. In requesting said Clement to come to said car, state whether R. G. Porter requested his presence as an expert in dealing with gasoline and other inflammable liquids? Answer: Yes.

"Question 33. At the time plaintiff went upon the car was he in the employment of the defendant? Answer: Yes."

"Question 19. Did the plaintiff at any time while he was upon said car, either acting by himself or in conjunction with another, loosen the dome cap? Answer: Yes.

"Question 20. If your answer to question 19 is 'No,' you need not answer this question, but if your answer is 'Yes,' then did the loosening of such dome cap cause or contribute to the subsequent explosion? Answer: Yes.

"Question 21. If your answer to question 20 is 'No,' you need not answer this question, but if your answer is 'Yes,' then was such loosening or unscrewing of the dome cap the proximate cause or one of the proximate causes of plaintiff's injury? Answer: Yes.

"Question 22. If you have answered that plaintiff, either by himself or acting with another, did not loosen the dome cap, you need not answer this, but, if you have answered that he did, then would the explosion have occurred but for that act? Answer: No."

It thus appears that the jury found that plaintiff was employed by Porter in the capacity of an expert in handling gasoline and other like liquids, and question 19 and answer thereto, quoted above, imply a finding that the act of loosening the dome cap was chargeable to the plaintiff, and not to Porter, defendant's agent; in other words, that plaintiff himself, and not Porter, took the initiative in that act and was responsible therefor.

If there were any testimony in the record to the effect that, after employing plaintiff to remedy a dangerous condition, Porter, acting upon his own initiative and with the assistance of plaintiff, unscrewed the dome cap, or that Porter himself decided that the dome cap should be unscrewed and directed the plaintiff so to do, then it might be said that there was evidence sufficient to sustain the finding that the defendant, through Porter, was guilty of negligence, but we have found no such testimony in the record. In his motion for rehearing the following is quoted from plaintiff's testimony upon his cross-examination by defendant's counsel:

"I have no idea how many workmen the Gulf, Colorado & Santa Fé Railway Company had in its shops, but they have a good many. They have shops and facilities here for repairing cars and plenty of men. At the time I was in the employ of the Gulf, Colorado & Santa Fé Railway Company I was under Bob Porter, working under his instructions, but my general occupation was that of local agent for the Producers' Refining Company. I do not know why Mr. Porter asked me to come and tighten that leaky car instead of an employé. If they had had 150 men I would have gone up there. Within the knowledge of Mr. Porter I had been dealing with gasoline a long time. As to whether it is true that Mr. Porter asked me to come up there because of my special knowledge and dealings with gasoline, will say I think the real reason was because he had instructions from Mr. Gates' office."

[11, 12] In our opinion, this testimony was insufficient to support a finding that Porter rather than plaintiff instigated and directed the act of unscrewing the dome cap, and no other testimony has been cited by plaintiff, or found by us, which would support such a finding. The fact that plaintiff was "under Porter, working under his instructions," falls far short of proof that Porter, after employing the plaintiff as an expert to remedy a dangerous condition, assumed charge of the work, and upon his own initiative undertook to unscrew the dome cap, and directed plaintiff to assist him in so doing. Furthermore, the findings upon issues 4, 5, and 6, copied above, were that some one of defendant's employés removed, or caused or permitted the dome cap to be removed, or loosened, and that such loosening of it was negligence, which was one of the proximate causes of plaintiff's injury. In answer to those issues, the name of the employé who did that act, or permitted it to be done, was not given; in other words, those issues and findings thereon contained no statement that Porter, rather than plaintiff, who was likewise an employé of the defendant company, was chargeable with the act of unscrewing the dome cap. However, aside from that question, and assuming for the sake of argument that the findings of the jury in answer to issues 4, 5, and 6 were to the effect that the act of unscrewing the dome cap was properly chargeable to Porter rather than to plaintiff, and that such act on the part of Porter was negligence, which was one of the proximate causes of plaintiff's injury, yet we know of no rule of law that would excuse plaintiff from the consequences of the defense of assumed risk by reason of the fact that another servant, Porter, also assumed the same risk at the same time, in the absence of any testimony to the effect that Porter, as vice principal of defendant, specifically commanded plaintiff to unscrew or assist in unscrewing the dome cap, assuring him at the time that there was no danger in so doing, and that plaintiff obeyed said command, relying upon such assurance, and was excusably ignorant of the danger himself. In 18 Ruling Case Law, p. 548, the following is said:

"Knowledge, then, or opportunity by the exercise of reasonable diligence to acquire knowledge, of the peril which subsequently results in injury to the employé, is the foundation of the liability of the employer. Liability exists when the perils of the employment are known to the employer, but not to the employé; and no liability is incurred when the employé's knowledge equals or surpasses that of the employer."

After a statement of the general rule, in the same authority, that an employé does not assume the risk of injury from a danger when he acts upon the command of the master, who assures him at the time that there is no danger of injury, the following is said, at page 703:

"By no means, however, is an employé, under all circumstances and at all hazards, bound to obey the command or accept the assurances of the employer. The peril may be so great that no prudent person would chance it. Neither the employer nor his representative has a right to give such an order or assurance; and the employé has no right to act pursuant thereto; and if the employé receive an injury, knowing as well as the employer the danger to which he exposes himself, he will not be permitted to recover. The fundamental inquiry here, as elsewhere, involves the comparative knowledge of the parties. The fact that the employé acted pursuant to an immediate command is a cogent evidentiary fact bearing on this issue. Inasmuch as commands usually proceed from persons having superior knowledge, it may be presumed, in case an employé is ordered to do certain work, that the employer has superior knowledge of the perils attending performance; and in the absence of anything to the contrary, or where the case otherwise is in doubt, this presumption must prevail in behalf of the plaintiff. But, where the evidence does not leave the fact of knowledge on the part of the employé a matter of conjecture and doubt, the presumption is unavailing."

Such cases as M., K. & T. Ry. Co. v. Hamilton, 30 S. W. 679, Alamo Oil & Refining Co. v. Curvier, 136 S. W. 1132, and Lone Star Lignite Mining Co. v. Caddell, 134 S. W. 841, cited by plaintiff in support of his motion for rehearing, are not in conflict with the quota-

tions from Ruling Case Law shown above, but are in harmony with them.

[13] Plaintiff having been employed as an expert to remedy a dangerous condition, the general rule imposing the duty upon the master to furnish a servant a safe place to work was not applicable. Magnolia Petroleum Co. v. Ray, 187 S. W. 1085, and authorities there cited.

In the motion now under discussion complaint is made that in our opinion on original hearing we were unfair to the plaintiff in failing to note the statement given by plaintiff on the witness stand that he was crazy with pain and did not notice what he said at the time he .was questioned by Mr. Greenwood, state fire marshal, the answers to which questions were introduced by the defendant. As clearly shown in our original opinion, we did not predicate our findings that plaintiff's own testimony showed that he assumed the risk of his injury upon any other evidence than his testimony given on the witness stand. We set out the impeaching statement merely for the purpose of a better understanding of plaintiff's testimony while on the witness stand, and which we quoted; and it may be noted further in this connection that another written statement signed by the plaintiff soon after his injury, and given to defendant's claim adjuster, was also introduced in evidence by the defendant to discredit his testimony on the stand, which was in substantial accord with the other document. But plaintiff testified on the stand that he signed that statement without first reading it over and denied making the material portions of it.

[14] We recognize the rule that it was the province of the jury to disregard both of those impeaching instruments and accept the plaintiff's testimony upon the trial in lieu thereof.

The motion for rehearing is overruled.